United States Court of Appeals
Fifth Circuit
FILED
October 1, 2010

Lyle W. Cayce
Clerk

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED OCT 25 2010
LORETTA G. WHYTE
CLERK

No. 07-30942

D.C. Docket No. 2:06-CV-4340 L

DANIEL CASTELLANOS-CONTRERAS; OSCAR RICARDO DEHEZA-ORTEGA; RODOLFO ANTONIO VALDEZ-BAEZ

Plaintiffs - Appellees

v.

DECATUR HOTELS LLC; F PATRICK QUINN, III

Defendants - Appellants

Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before JONES, Chief Judge, and KING, JOLLY, DAVIS, SMITH, GARZA, BENAVIDES, STEWART, DENNIS, PRADO, OWEN, ELROD, SOUTHWICK, and HAYNES, Circuit Judges.[1]

JUDGMENT ON REHEARING EN BANC

This cause came on to be heard on rehearing en banc and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is reversed, and the cause is remanded to the District Court for further proceedings in accordance with the opinion of this Court.

[1] Judges Wiener and Clement stood recused and did not participate.

___ Fee________
___ Process________
_X_ Dktd________
___ CtRmDep________
___ Doc. No.________

IT IS FURTHER ORDERED that Plaintiffs-Appellees pay to Defendants-Appellants the costs on appeal to be taxed by the Clerk of this Court.

DENNIS, Circuit Judge, dissenting , joined fully by ELROD, Circuit Judge; and joined in Sections I and II only by KING, DAVIS, STEWART, and PRADO, Circuit Judges.

ISSUED AS MANDATE: 25 OCT [illegible]

A True Copy
Attest 25 OCT [illegible]

Clerk, U.S. Court of Appeals, Fifth Circuit
By: [signature]
Deputy

New Orleans, Louisiana

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT
BILL OF COSTS

**NOTE:** The Bill of Costs is due in this office *within 14 days from the date of the opinion, See* FED. R. APP. P. & 5TH CIR. R. 39. Untimely bills of costs must be accompanied by a separate motion to file out of time, which the court may deny.

**Daniel Castellanos-Contreras, et al. v. Decatur Hotels LLC and F. Patrick Quinn, III , No. 07-30942**

The Clerk is requested to tax the following costs against: **Appellees, Daniel Castellanos-Contreras, et al.**

| COSTS TAXABLE UNDER Fed. R. App. P. & 5th Cir. R. 39 | REQUESTED | | | | ALLOWED (If different from amount requested) | | | |
|---|---|---|---|---|---|---|---|---|
| | No. of Copies | Pages Per Copy | Cost per Page* | Total Cost | No. of Documents | Pages per Document | Cost per Page* | Total Cost |
| Docket Fee ($450.00) | | | | 450.00 | | | | 450.00 |
| Appendix or Record Excepts | 8 | 80 | .15 | 96.00 | 8 | 80 | .15 | 96.00 |
| Appellant's Brief | 10 | 65 | .15 | 97.50 | 10 | 65 | .15 | 97.50 |
| Appellee's Brief | | | | | | | | |
| Appellant's Reply Brief | 10 | 43 | .15 | 64.50 | 10 | 43 | .15 | 64.50 |
| Other: Supplemental Submissions (3) 10/03/08, 10/06/08, 1/23/09 | 8<br>8<br>8 | 16<br>5<br>51 | .15<br>.15<br>.15 | ~~19.20~~<br>~~6.00~~<br>~~61.20~~ | | | | |
| Brief Binding | | | | ~~30.00~~ | 10 | | 1.50 | 15.00 |
| Response to Motion for Reconsideration | 6 | 13 | .15 | ~~11.70~~ | | | | |
| Other: Supplemental Submissions (3) 10/01/09, 04/16/10, 05/19/10 | 21<br>20<br>20 | 21<br>32<br>14 | .15<br>.15<br>.15 | ~~66.15~~<br>~~96.00~~<br>~~42.00~~ | | | | |
| Brief Binding ( x 3 submissions) | | | | ~~90.00~~ | | | | |
| Total ~~$ 1130.25~~ | | | | | Costs are taxed in the amount of $ 723.00 | | | |

Costs are hereby taxed in the amount of $ 123.00 this 25th day of October, 2010.

CHARLES R. FULBRUGE III, CLERK

State of
County of ____________________

By ____________________
Deputy Clerk

I Leslie W. Ehret, do hereby swear under penalty of perjury that the services for which fees have been charged were incurred in this action and that the services for which fees have been charged were actually and necessarily performed. A copy of this Bill of Costs was this day mailed to opposing counsel, with postage fully prepaid thereon.
This 12th day of October, 2010.

____________________
(Signature)

Attorney for Appellants, Decatur Hotels, LLC and Patrick Quinn, III

*SEE REVERSE SIDE FOR RULES
GOVERNING TAXATION OF COSTS
*FIFTH CIRCUIT RULE 39*

***39.1 Taxable Rates.** The cost of reproducing necessary copies of the brief, appendices, or record excerpts shall be taxed at a rate not higher than $0.15 per page, including cover, index, and internal pages, for any for of reproduction costs. The cost of the binding required by 5TH CIR. R. 32.2.3that mandates that briefs must lie reasonably flat when open shall be a taxable cost but not limited to the foregoing rate. This rate is intended to approximate the current cost of the most economical acceptable method of reproduction generally available; and the clerk shall, at reasonable intervals, examine and review it to reflect current rates. Taxable costs will be authorized for up to 15 copies for a brief and 10 copies of an appendix or record excerpts, unless the clerk gives advance approval for additional copies.*

***39.2 Nonrecovery of Mailing and Commercial Delivery Service Costs.** Mailing and commercial delivery fees incurred in transmitting briefs are not recoverable as taxable costs.*

***39.3 Time for Filing Bills of Costs.** The clerk must receive bills of costs and any objections within the times set forth in* FED. R. APP. P. 39(D). *See 5TH CIR. R. 26.1.*

**FED. R. APP. P. 39. COSTS**

(a) ***Against Whom Assessed.*** The following rules apply unless the law provides or the court orders otherwise;

(1) if an appeal is dismissed, costs are taxed against the appellant, unless the parties agree otherwise;

(2) if a judgment is affirmed, costs are taxed against the appellant;

(3) if a judgment is reversed, costs are taxed against the appellee;

(4) if a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed only as the court orders.

(b) ***Costs For and Against the United States.*** Costs for or against the United States, its agency or officer will be assessed under Rule 39(a) only if authorized by law.

©) ***Costs of Copies*** Each court of appeals must, by local rule, fix the maximum rate for taxing the cost of producing necessary copies of a brief or appendix, or copies of records authorized by rule 30(f). The rate must not exceed that generally charged for such work in the area where the clerk's office is located and should encourage economical methods of copying.

**(d) *Bill of costs: Objections; Insertion in Mandate.***

(1) A party who wants costs taxed must – within 14 days after entry of judgment – file with the circuit clerk, with proof of service, an itemized and verified bill of costs.

(2) Objections must be filed within 10 days after service of the bill of costs, unless the court extends the time.

(3) The clerk must prepare and certify an itemized statement of costs for insertion in the mandate, but issuance of the mandate must not be delayed for taxing costs. If the mandate issues before costs are finally determined, the district clerk must – upon the circuit clerk's request – add the statement of costs, or any amendment of it, to the mandate.

(e) ***Costs of Appeal Taxable in the District Court.*** The following costs on appeal are taxable in the district court for the benefit of the party entitled to costs under this rule:

(1) the preparation and transmission of the record;

(2) the reporter's transcript, if needed to determine the appeal;

(3) premiums paid for a supersedeas bond or other bond to preserve rights pending appeal; and

(4) the fee for filing the notice of appeal.

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

FILED
October 1, 2010

Lyle W. Cayce
Clerk

No. 07-30942

DANIEL CASTELLANOS-CONTRERAS; OSCAR RICARDO DEHEZA-ORTEGA; RODOLFO ANTONIO VALDEZ-BAEZ

Plaintiffs - Appellees

v.

DECATUR HOTELS LLC; F PATRICK QUINN, III

Defendants - Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JONES, Chief Judge, and KING, JOLLY, DAVIS, SMITH, GARZA, BENAVIDES, STEWART, DENNIS, PRADO, OWEN, ELROD, SOUTHWICK, and HAYNES, Circuit Judges.[1]

HAYNES, Circuit Judge, joined by JONES, Chief Judge, and JOLLY, SMITH, GARZA, BENAVIDES, OWEN, and SOUTHWICK, Circuit Judges in full; joined by KING, DAVIS, STEWART and PRADO, Circuit Judges, as to Section III.A. only:

A group of hotel workers present in this country under H-2B visas[2] ("the Workers") sued Decatur Hotels and Patrick Quinn (collectively "Decatur") alleging violations of the Fair Labor Standards Act ("FLSA"). Decatur moved to

[1] Judges Wiener and Clement stood recused and did not participate.

[2] The term "H-2B visa" refers to a visa authorized by 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

dismiss and for summary judgment, and the Workers moved for partial summary judgment. In a single order, the district court granted the Workers' motion in part and denied Decatur's motions. Thereafter, the court certified that order for interlocutory appeal to this court. On appeal, a panel of this court reversed the district court and rendered judgment for Decatur. *See Castellanos-Contreras v. Decatur Hotels LLC*, 559 F.3d 332 (5th Cir.), *withdrawn and replaced by* 576 F.3d 274 (5th Cir. 2009). En banc review was granted, thus vacating the panel opinion. *Castellanos-Contreras v. Decatur Hotels LLC*, 601 F.3d 621 (5th Cir. 2010). We now REVERSE the district court's order denying Decatur's motion and REMAND for entry of judgment in favor of appellants.

## I. Facts and Procedural Background

In the wake of the devastation wrought upon the city of New Orleans by Hurricane Katrina, Decatur found itself unable to hire a sufficient number of American workers to staff its hotel properties. It was solicited by Virginia Pickering, who had a business known as Accent Personnel Services, to use her service to navigate the regulations necessary to allow Decatur to legally hire workers from other countries. Pickering also had a business known as VP Consultants that provided data about employers seeking foreign workers to various foreign recruitment companies. The Workers allege these foreign recruitment companies charged them to provide information about U.S. companies seeking foreign workers and the procedures for obtaining such jobs and securing necessary visas.

The Workers consist of one hundred people[3] from various Latin American countries who came to New Orleans on H-2B visas to work at Decatur's hotels in housekeeping and other service roles. The Workers allege they were required

[3] Originally, three foreign workers filed suit seeking to represent themselves and similarly situated H-2B Decatur workers. Ninety-seven such workers filed notices of consent to participate in the lawsuit.

to pay (1) placement fees charged by various recruitment companies, (2) their own visa-application fees, and (3) all transportation expenses necessary to relocate to the United States. The parties do not dispute that Decatur did not reimburse the Workers for these expenses. The parties also do not dispute that Decatur paid its own H-2B application fees and the recruitment fees Pickering and Accent charged it.

All parties agree that Decatur paid the Workers more than the minimum wage should the court find Decatur was not required to reimburse the disputed expenses. However, the Workers argue that federal law requires Decatur to reimburse them for their travel expenses, visa fees, and recruitment payments during their first week of work, failing which, such sums must be deducted from the first week's wage before calculating whether a minimum wage, under the FLSA, was paid. Contending that these deductions took their pay below the minimum wage, the Workers sued Decatur under the FLSA.

In the district court, Decatur moved for summary judgment, contending that it was not required under the FLSA (or any other applicable law) to reimburse the travel, visa, and recruitment expenses in question. For their part, the Workers moved for summary judgment contending that the court was required to deduct the disputed expenses as part of the minimum wage calculation and that, under that calculation, Decatur had violated the FLSA. In a single order, the district court granted the Workers' motion in part and denied Decatur's motion entirely. The district court held that the only remaining issues were the strictly mathematical calculations of wages actually paid and, should that yield a finding of liability, the amount of damages due. Thereafter, it certified this order under 28 U.S.C. § 1292(b) for interlocutory appeal, and a motions panel of this court granted leave to appeal.

The parties and the en banc court agree that the FLSA applies to the Workers in the situation before the court. However, the parties disagree on the

threshold question of whether this court has jurisdiction to consider this appeal and, unsurprisingly, on the merits question of whether the disputed expenses can or should be deducted as part of the FLSA calculation. A panel of this court opted to utilize its discretion to exercise jurisdiction in this case and ultimately found that Decatur was correct on the merits. After granting en banc rehearing and following reargument of the case, we now issue this opinion, again finding jurisdiction and reversing the district court on the merits.

II. Standard of Review

The court reviews its own jurisdiction de novo. *Nehme v. INS*, 252 F.3d 415, 420 (5th Cir. 2001).

The court reviews certified orders de novo. *Tanks v. Lockheed Martin Corp.*, 417 F.3d 456, 461 (5th Cir. 2005). Under 28 U.S.C. § 1292(b), a grant or denial of summary judgment is reviewed de novo, applying the same standard as the district court, *First Am. Bank v. First Am. Transp. Title Ins. Co.*, 585 F.3d 833, 836-837 (5th Cir. 2009), but review only extends to controlling questions of law, *Tanks*, 417 F.3d at 461. Further, the court's inquiry "is limited to the summary judgment record before the trial court." *Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 871 (5th Cir. 2009). The court must view the evidence in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and the movant has the burden of showing this court that summary judgment is appropriate, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate where the competent summary judgment evidence demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Bolton v. City of Dallas*, 472 F.3d 261, 263 (5th Cir. 2006); *see* FED. R. CIV. P. 56(c). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

III. Discussion

A. Jurisdiction

The jurisdiction question presented to the en banc court breaks down into two parts: (1) is there appellate jurisdiction to reach any question other than whether the FLSA generally applies to the Workers (*i.e.*, do we have the power to hear the issues Decatur presents), and, if so, (2) should we exercise our discretion to hear this appeal? We address each question in turn.

1. Appellate Jurisdiction

The Workers contend that the district court only certified the question of whether the FLSA generally applies to the Workers, *i.e.*, were the Workers entitled to be paid the minimum wage? In turn, they argue that this question is not one "as to which there is a substantial ground for difference of opinion" and, thus, they contend that we lack jurisdiction at all. As a fall back position, they contend that, at most, we have jurisdiction to decide only this threshold question but not the question of whether federal law requires reimbursement of the expenses in question. Decatur contends that jurisdiction is proper because the order certified necessarily includes consideration of the "merits" question of whether the disputed expenses are ever chargeable against wages paid. We agree with Decatur.[4]

The district court granted in part the Workers' motion for summary judgment and denied Decatur's motion for summary judgment in the single order that is the subject of the certified interlocutory appeal. In order to grant the Workers' motion and deny Decatur's motion, the district court had to examine whether the expenses in question were of the kind for which reimbursement—to the extent necessary to stay at or above minimum wage—is required by the law. The district court itself stated that it considered these

[4] Moreover, the Workers conceded at oral argument that the jurisdictional question that remains before the court is purely prudential.

matters to be "factual issues," *i.e.*, that the law provides for their recovery depending on the facts of a given case. In deciding that there were "fact questions" on these issues, the district court necessarily decided that such expenses could sometimes be reimbursable, at least under certain facts. If, as a matter of law, they are not, the district court's order would be incorrect.

Under § 1292(b), it is the order, not the question, that is appealable. *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996); *see Melder v. Allstate Corp.*, 404 F.3d 328, 331 (5th Cir. 2005) (raising argument in district court deemed sufficient to render it "fairly included" in the certified order); *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 380 n.2 (5th Cir. 2004) (reaching alternative grounds addressed in the certified order but omitted from the list of certified questions); *Reserve Mooring Inc. v. Am. Commercial Barge Line, LLC*, 251 F.3d 1069, 1070 n.4 (5th Cir. 2001) (same); *see also Schlumberger Techs. v. Wiley*, 113 F.3d 1553, 1557 n.6 (11th Cir. 1997) (holding that, if an issue is contained within the order from which the interlocutory appeal is taken, the district court's refusal to certify that issue does not defeat court of appeals' jurisdiction over that issue). If the district judge makes certification as provided, "[t]he Court of Appeals . . . may . . . permit an appeal to be taken from such *order*." 28 U.S.C. § 1292(b) (emphasis added). Section 1292(b) limits this court's jurisdiction over interlocutory appeals to reviewing "questions that are material to the lower court's certified order." *Adkinson v. Int'l Harvester Co.*, 975 F.2d 208, 212 n.4 (5th Cir. 1992); *see Ducre v. Executive Officers of Halter Marine, Inc.*, 752 F.2d 976, 983 n.16 (5th Cir. 1985) ("Thus, the appellate court may address all issues material to the order and is not limited to consideration of the 'controlling question.' This is especially so when the issues outside the 'controlling question' provide grounds for reversal of the entire order." (citations omitted)); *see also J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 115 (2nd Cir. 2004) ("We are not necessarily limited to the certified issue, as we have the

discretion to consider any aspect of the order from which the appeal is taken."); *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1255-56 (11th Cir. 2004) ("[W]e have the power to 'review an entire order, either to consider a question different from the one certified as controlling or to decide the case despite the lack of any identified controlling question.'" (quoting *Yamaha*, 516 U.S. at 205)); *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1455 (6th Cir. ) ("[E]ven those issues not properly certified are subject to our discretionary power of review if otherwise necessary to the disposition of the case."), *cert. denied*, 488 U.S. 880 (1988).

The district court's conclusion that there were fact issues was based upon its finding that the expenses in question could be reimbursable. If it is true that the expenses are reimbursable, then liability to the Workers depends upon calculating what each Worker paid for the disputed expenses, subtracting that figure from what each Worker was paid after his/her first week, and dividing the remaining amount by the hours worked. If that amount is above the minimum wage, no liability attaches. *See generally* 29 C.F.R. § 531.36 (2010); *see also Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1237 n.11 (11th Cir. 2002) (providing an example of an FLSA minimum wage calculation). If it falls below the minimum wage, then damages are based at least in part on this calculation of the "back pay" owed to the employee. *See* 29 U.S.C. § 216(b) (2010). Thus, the predicate finding that the disputed expenses are reimbursable costs that the employer owes the Workers is critical and material to the district court's conclusion that there are fact issues. However, the threshold question of whether such expenses are, as a category, reimbursable is a legal question that can properly be the subject of interlocutory review. We conclude that we have appellate jurisdiction to review the question of whether the travel, visa, and recruitment expenses in question are required to be reimbursed as part of the minimum wage calculation under the FLSA.

2. Discretion

The conclusion that we have the power to consider these questions does not end our jurisdictional analysis. Interlocutory review under § 1292(b) is not mandatory; rather, it is discretionary. Thus, we must consider whether we should address these questions at this stage.

Suffice it to say that this is a question about which reasonable jurists can—and, in the case of this court, do—debate. A motions panel of this court permitted Decatur to pursue this appeal, and the original panel exercised its discretion to hear the appeal. Others on our court might have had a different take had they been on either panel. But we are no longer at the beginning of this case; instead, we are very far along. Considerable time has passed, two panel opinions have issued, and the parties have briefed the merits three times: to the original panel, in connection with the rehearing petitions, and in merits briefing to the en banc court. Additionally, this case has been the subject of two oral arguments. After so much time and effort has been expended by both the parties and the court as a whole, the discretionary decision *now* becomes much different, and the majority of the court agrees it should be resolved in favor of hearing the merits.

B. The Merits

Turning then to the merits, we address each category for which the Workers claim reimbursement is required: (1) inbound travel expenses; (2) visa expenses; and (3) recruitment expenses.

1. Inbound Travel and Visa Expenses

No statute or regulation expressly states that inbound travel expenses must be advanced or reimbursed by an employer of an H-2B worker. There *are* laws that say that outbound travel expenses (*i.e.*, return) must be paid for H-2B workers under certain circumstances and that inbound expenses for H-2A

workers require reimbursement,[5] but no statute or regulation expressly requires reimbursement for inbound travel for H-2B workers. *See* 8 U.S.C. § 1184(c)(5)(A) (requiring payment of **outbound** transportation costs in certain circumstances for H-2B workers); 20 C.F.R. § 655.102(b)(5)(I) (2009) (requiring payment of inbound transportation costs in certain circumstances for **H-2A** workers). Silence on this issue, in the face of these specific laws governing transportation, is deafening.

Similarly, no law or regulation provides that fees for the employee side of the visa application process must be paid by the employer. *See* 22 C.F.R. § 40.1(*l*)(1) (2010) (requiring non-immigrant visa applicants, such as the Workers here, to submit processing fees when they apply for visas). It is undisputed that Decatur paid its own fees for the employer side of the process—the application to hire H-2B workers. *See* 8 C.F.R. §§ 103.7(a), 103.7(b)(1), 214.2(h)(2)(i)(A) (2010) (requiring, collectively, that a U.S. employer submit certain forms and filing fees to become an H-2B visa sponsor).

While this lack of law would seem to end the matter as to both the travel and visa expenses, the Workers advance various arguments in support of their reimbursement claim which we now address. First, the Workers argue that both expenses are "specifically required for performance of the employer's particular work" because the employee must have a visa and must get to the employer in order to work legally. In short, they cannot "use" the transportation and visa outside the context of that employment. They contend that these expenses are "primarily for the benefit and convenience of the employer." Hence, they argue that these expenses constitute "tools of the trade" pursuant to 29 C.F.R. § 531.35

---

[5] As defined by 8 U.S.C. § 1101(a)(15)(H)(ii)(a), "H-2A" workers include only those individuals temporarily relocating to the United States to perform "agricultural labor and services." Conversely, "H-2B" workers include only those individuals temporarily relocating to the United States to perform other non-agricultural labor or services.

(2010),[6] such that their payment of these expenses are "de facto deductions" from their wages.

This argument stretches the concept of "tools of the trade" too far. Our precedents look to the nature of disputed expenses rather than simply declaring every cost that is helpful to a given job an employer expense. *Mayhue's Super Liquor Stores, Inc. v. Hodgson*, 464 F.2d 1196, 1199 (5th Cir. 1972) (asking whether an act tended to shift employer expenses); *Brennan v. Veterans Cleaning Servs., Inc.*, 482 F.2d 1362, 1369 (5th Cir. 1973) (assessing various claimed expenses by analogy to other expenses previously deemed not properly chargeable). A visa and physical presence at the job site are not "tools" particular to this "trade" within the meaning of the applicable regulations *See also* 29 C.F.R. § 531.32 (2010) (describing items like safety caps, explosives, lamps, electric power, company police or security, taxes and insurance on employer buildings, railway fare for maintenance-of-way railway workers, and uniforms as "other facilities" not subject to deduction from the employees' wages).[7]

---

[6] The Workers also contend that wages must be paid "free and clear" and that the singular exception contained in 29 U.S.C. § 203(m) supports their position. *See* 29 U.S.C. § 203(m) (permitting an employer to deduct from wages the cost of furnishing meals and lodging). Section 203(m) does not directly impose liability upon employers for expenses that employees incur, and it has nothing to do with travel or visa expenses. In short, the Workers' "free and clear" argument begs the question of whether these are expenses that the employer is legally required to bear—a question we answer in the negative.

[7] Additionally, the Workers' argument that these expenses are specific and unique to the employer in question is contradicted by the federal regulation governing the use and transferability of H-2B visas: "If the alien is in the United States and seeks to change employers, the prospective new employer must file a petition on Form I-129 requesting classification and an extension of the alien's stay in the United States." 8 C.F.R. § 214.2(h)(2)(i)(D) (2010). In other words, the employee does not have to return to his or her home country and start from the beginning in order to change employers once in the United States. It is interesting to note that it appears that at least some of the Workers are still in the United States despite the seemingly temporary nature of the H-2B visa and the recent fifth anniversary of Hurricane Katrina.

Second, the Department of Labor, briefing as an amicus in support of the Workers, also points to its own recent "interpretation" as informing whether travel and visa expenses are covered under the FLSA.[8] However, the Department's Field Assistance Bulletin No. 2009-2 ("Bulletin") was issued long after the events in question. The general rule, applicable here, is that changes in the law will not be applied retroactively when the result would be that "new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard." *Bradley v. Sch. Bd. of Richmond*, 416 U.S. 696, 720 (1974). Thus, even "'congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.'" *Landgraf v. USI Film Prods.*, 511 U.S. 244, 272 (1994) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). Whatever deference may be due to the Department's informally promulgated Bulletin in the future, it does not itself in any way purport to apply retroactively.[9] Accordingly, we decline to apply it to the situation here.

The dissenting opinion focuses on the Department's previous position that relocation expenses paid by the employer could not be *deducted* from wages.

---

[8] Notably, the Workers make no effort to rely upon the Department's recently revised "interpretations" in support of their own position. In fact, in originally requesting rehearing, the Workers argued that casually promulgated interpretations of the FLSA—like the one now at issue—should not inform the court's understanding of the statute.

[9] We acknowledge that the regulatory landscape is now very different than it was just a few short years ago. *See, e.g.*, 20 C.F.R. § 655.22(g)(2) (2010) and 8 C.F.R. § 214.2(h)(6)(i)(B) (2010). We express no opinion as to how our decision today affects those new regulations.

Moreover, we do not, as the dissenting opinion suggests, claim that the Secretary's amicus briefing is entitled to no deference because the Bulletin and briefing were filed after the events giving rise to this suit. Rather, the Secretary contends, paradoxically, that the position of the Department has remained the same for fifty years save a 98-day period but also concedes that the Department publicly informed employers it would suspend the enforcement of FLSA standards relating to reimbursement issues from 1994 until 2008—when it concluded that reimbursement was not necessary. In short, we decline to engage in the ex post imposition of new duties that did not clearly exist at the time of the events giving rise to this suit under the guise of *Auer* deference.

Significantly, the Department did not address the issue of *reimbursing* relocation expenses until 1994. At that point, the Department announced it would analyze the issue of reimbursement and adopted a position of non-enforcement during its deliberations. The first time the Department specifically spoke to reimbursement in the context of alleged "kickbacks" like those at issue here was its announcement in 2008 that it would not require reimbursement.[10] The Department then reversed itself 98 days later to assert for the first time that reimbursement was required. Carefully read, the Department of Labor letters did not in fact include or promote a "reimbursement required" position until the Department informally changed course in 2009. In fact, none of the letters cited in the dissenting opinion expressed a clear,

---

[10] The dissenting opinion argues that a 1986 Department letter produced in response to an employer's effort to settle its outstanding liability constitutes an earlier pronouncement of the Department's position. Properly read in context, it is not. The correspondence answers a specific question: whether the Department persisted in its belief that employers could not make transportation *deductions* that cut into the minimum wage, or, as the employer contended, it had recently adopted that position. The dissenting opinion's quoted language is nothing more than the administrator suggesting that reimbursement likely could be required under the facts of that case. Importantly, the decisions of the district court in the underlying case reveal: (1) the letter addressed agricultural workers(now properly categorized as H-2A workers); (2) the case involved direct payments by the workers to the employer for transportation expenses; and (3) the letter was issued as a rejection of the employer's attempts to find a way to settle its outstanding minimum wage liability—not a general inquiry into whether such liability existed. Thus, the 1986 letter is exactly the sort of *post hoc* rationalization in the context of active litigation that the Supreme Court warned will undercut the authority of such agency pronouncements. *Auer v. Robbins*, 519 U.S. 452, 462 (1997).

Moreover, as a litigation document prepared in a very specific context, it is doubtful that even the most diligent employer could have readily accessed (or would have known to look for) this so-called "interpretation." While not dispositive, it is noteworthy that the dissenting opinion would hold an employer liable under such a piece of random, litigation-specific correspondence where the affidavits of the very workers at issue in this case do not state that the Workers ever requested or expected reimbursement prior to this litigation. Even now, after all these years, if Decatur wanted to write a check, it would not know the amount. Yet the dissenting opinion would hold that Decatur should somehow have divined such a figure on its own within one week of the Workers starting their employment, no less, despite the fact that it had no reasonable way of determining it—according to the dissent—had a *sua sponte* duty to investigate the Workers' costs and provide reimbursement of as yet untold sums during their first week on the job in order to avoid a Wage-Hour violation.

unequivocal stance that employee-incurred relocation costs constitute a kickback. Thus, this inconsistency and ambiguity—properly afforded the deference discussed in the dissenting opinion—did not create any affirmative duty to reimburse and, moreover, merely underscores the problem with the suggestion that we retroactively apply the Department's most recent guidance.

Finally, the Workers cite to the Eleventh Circuit's decision in *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228 (11th Cir. 2002), to support their position. *Arriaga*, however, dealt with H-2A workers, not H-2B workers. *Id.* at 1232-33. Historically, H-2A and H-2B workers have been treated differently. *Compare* 20 C.F.R. §§ 655.90–.113 (2007) (broadly setting out a distinct regulatory regime for the management of the H-2A program) *with* 20 C.F.R. §§ 655.1–.4 (providing the regulatory regime for H-2B workers) (2007)[11]; *see also Sweet Life v. Dole*, 876 F.2d 402, 406 (5th Cir. 1989) (explaining that the H-2 program was specifically redesigned by Congress in 1986 to "separat[e] agricultural from nonagricultural workers in the administrative scheme"). Indeed, the regulations specifically provide some transportation reimbursement obligation for H-2A workers while remaining silent on similar expenses incurred by H-2B workers. Thus, *Arriaga's* reasoning does not control here.

Accordingly, we conclude as a matter of law that these expenses are not reimbursable,[12] and the district court erred in denying Decatur's motions on these points.

2. Recruitment Expenses

---

[11] The regulations cited have undergone substantial revision in recent years. The 2007 edition of the Code of Federal Regulations is cited because it was that version that the district court considered when it concluded that H-2A and H-2B workers were not sufficiently distinguishable to prevent *Arriago* from applying to the instant case.

[12] Because we hold that the FLSA does not obligate Decatur to reimburse the Workers for their transportation expenses, we do not consider Decatur's argument in the alternative that, even if the FLSA otherwise purports to obligate reimbursement, the Portal-to-Portal Act nevertheless bars recovery.

The Workers raise some of the same arguments regarding the recruitment expenses, and we will not repeat our analysis of those arguments.[13] Again, the statute and regulations are silent, so we turn to considering the Workers' additional arguments regarding recruitment expenses.

The Workers argue that they were required to pay recruiting fees and, therefore, those fees should be considered "part of the job," citing *Rivera v. Brickman Group Ltd.*, Civ. No. 05-1518, 2008 WL 81570 (E.D. Pa. Jan. 7, 2008). They contend that fact issues are presented as to the nature of the payments and whether they were required by Decatur. In response to Decatur's motion for summary judgment, the Workers proffered no evidence to support the concept that Decatur required any recruitment fees to be paid to the foreign recruiters or that it required the Workers to use these recruiters to apply to Decatur. The fact that the Workers benefitted from these services by finding jobs with Decatur does not suggest that Decatur was the one who required their use of job placement firms.[14]

---

[13] It is noteworthy, however, that even *Arriaga* did not require reimbursement of the recruitment expenses.

[14] The Workers' suggestion that unresolved fact disputes prevent this court from considering this point is belied by the record. The affidavits submitted by some of the Workers indeed talk about going to foreign recruiters and being charged fees but in no way suggest that *Decatur* charged those fees or required their payment. Instead, the affidavits say that they were told by the *foreign recruiter* that they "had to pay for the cost of the program to be able to go and work for the Defendants." The only tie between the foreign recruiter and Decatur comes in the Workers' statement that they "understood that the [foreign recruiter's] agency was an agency utilized by the Defendants for the recruitment of workers like me . . . ." The affiant's "understanding," without any stated basis for such "understanding" is no evidence of agency tying the foreign recruiter (such as UniverJobs) to Decatur. *See Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (holding that affidavits offered to support or oppose summary judgment must be based on personal knowledge to create a genuine issue of material fact); *see also* FED. R. CIV. P. 56(e)(1). Nor is there any evidence of a contract between UniverJobs or the other foreign recruiters and Decatur. Thus, even if we were to follow *Rivera*'s reasoning, it would not apply here.

Moreover, the claim asserted rests on the argument that when the Workers paid for recruiting services in their home countries, they paid an expense belonging to the employer. As with visa costs, both employers and employees contribute to the recruiting cost of using the program: employers pay recruiters to help them navigate the visa application process and locate workers in foreign countries (here, Decatur hired Accent), and employees pay recruiters in their home countries to help them find work in the United States. The division of payment for each party's respective benefit indicates, as in the visa context, that the Workers' use of recruiters in their own countries was not Decatur's business expense. Again, while recruiters in general may benefit both parties, the payment for that benefit can be (and has here been) apportioned to each party appropriately. It is undisputed that Decatur paid the fees it was charged by Accent for recruiting services. Thus, no material fact issue was raised on this point.

Newly enacted Department of Labor regulations[15] (promulgated after the time in question) actually support the conclusion that recruitment expenses were not reimbursable at the time. These regulations provide protection for guest workers from unscrupulous recruiters by requiring employers to contractually obligate those with whom they work not to charge employees recruiting fees. These new regulations actually suggest that the expenses in question were not previously to be charged against the employers. If they were to be so charged previously, there would be no need to protect the employees as provided in the new regulations.

In sum, Decatur was not required to reimburse the Workers for the fees they paid to the various job placement firms. Consequently, the district court erred in denying Decatur's motions on this point.

---

[15] 20 C.F.R. § 655.22(g)(2) (2010) and 8 C.F.R. § 214.2(h)(6)(i)(B) (2010).

Accordingly, we REVERSE the district court's judgment and REMAND for entry of judgment in favor of appellants.

REVERSED and REMANDED for entry of judgment.

DENNIS, Circuit Judge, dissenting, joined fully by ELROD, Circuit Judge; and joined in Sections I and II only by KING, DAVIS, STEWART, and PRADO, Circuit Judges.[1]

The majority opinion (1) ignores controlling Supreme Court decisions holding that federal courts must give deference to the Department of Labor's ("DOL") reasonable interpretations of its own valid regulations under the Fair Labor Standards Act ("FLSA"); (2) adopts and applies its own eccentric interpretation of the FLSA and the DOL's regulations, holding, contrary to the DOL's views, that the plaintiffs, temporary workers from South American nations, have no right to sue their employers under the FLSA for paying them sub-minimum wages by refusing to reimburse them for their outlay for visa, transportation and recruitment costs incidental to and for the primary benefit of the employers' foreign-labor recruitment program; (3) misconstrues the record in the district court, treating material facts as undisputed, when, in truth, those facts are in dispute—the evidence as to them is mostly undiscovered, and the district court has not yet tried or decided them; and (4) misapplies Supreme Court and circuit precedents to improperly reach questions not within our appellate jurisdiction under 28 U.S.C. § 1292(b). I respectfully dissent.

The most unfortunate and harmful part of the majority's decision, which must be addressed first, is its incorrect interpretation and application of the FLSA, the DOL's regulations, and the DOL's interpretation of its regulations. In its erroneous ruling, the majority opinion creates a split between us and the Eleventh Circuit and establishes a circuit precedent that permits employers to

---

[1] In other words, Judges King, Davis, Stewart, and Prado agree with the majority opinion that it is appropriate for this court to reach the merits of the case within its limited, certified appellate jurisdiction but disagree with the majority as to the merits of the case and join this dissenting opinion in that respect. Judges Dennis and Elrod dissent from the majority's decision pertaining to both its exercise of appellate jurisdiction and the merits of the case.

shift their costs in recruiting foreign labor to their temporary foreign worker recruits; this allows those employers to effectively reduce temporary foreign workers' wages below the nationally established minimum wage floor and creates a competitive disadvantage for other employers who pay legitimate wages at or above that floor.

The majority opinion also adopts the panel's cavalier misreading of the district court's decision to erroneously misapply Supreme Court and circuit precedents and to overreach our appellate jurisdiction under 28 U.S.C.§ 1292(b). This second unfortunate precedent is also regrettable, but it is less imitable and harmful than the majority's FLSA precedent because the majority opinion cloaks its jurisdictional overreach by misrepresenting the district court's decision as having reached and decided the merits before certifying a threshold question of law to this circuit.

I.

In August 2005, Hurricane Katrina flooded major low-lying parts of New Orleans, causing hundreds of hotel and tourist workers to evacuate the city permanently or for extended periods. Hotel businesses revived quickly, however, because Katrina left the city's tourist venues, located on higher ground, relatively unscathed. Faced with a labor shortage, defendants-appellants hotel employers, Decatur Hotels, LLC and F. Patrick Quinn III ("Decatur"), obtained approval from the DOL to temporarily recruit, employ and obtain visas for plaintiffs-appellees from South American nations as H-2B workers (the "Hotel Workers").[2]

[2] Under the H-2B program, guest workers are "authorized to come to the United States temporarily to perform services or labor for . . . an employer" who has "petitioned" for the right to employ H-2B guest workers and whose petition has been approved by the DOL. 8 C.F.R. § 214.2(h)(1)(i). Before H-2B visas can be granted, the prospective employer must "establish . . . the need for the employee[s]" and that such a need "will end in the near, definable future[,]

Decatur recruited the Hotel Workers from Bolivia, the Dominican Republic and Peru. The Hotel Workers allege that Decatur's agents required them to pay between $3500 and $5000 each for the recruiters' fees, visa fees and transportation costs. The workers, who served as housekeepers, desk clerks and maintenance staff, were paid between $6.04 and $7.79 per hour, but Decatur refused to reimburse them for their visa, transportation and recruitment costs. Consequently, plaintiffs contend that these costs reduced their effective wages to substantially less than the federal minimum wage of $5.15 per hour in their first pay periods. As a result, they were forced to work for three to five months just to recoup their visa, transportation and recruitment costs. Moreover, it is undisputed that under the H-2B program, they were legally prohibited from working for other employers outside the program who might have paid them higher wages. The Hotel Workers argue that Decatur's system of compensation and de facto wage deductions placed them in debt peonage.

As a result, wage disputes arose between Decatur and the Hotel Workers. On August 16, 2006, the Hotel Workers sued Decatur, alleging that Decatur had failed to comply with the minimum wage provisions of the FLSA, 29 U.S.C. §§ 203(m), 206(a). Specifically, the Hotel Workers alleged that Decatur's refusal to defray the Hotel Workers' out-of-pocket visa, transportation and recruitment

[g]enerally . . . one year or less." *Id.* § 214.2(h)(6)(ii)(B). Moreover, the DOL must determine that the workers' employment will not "displac[e] qualified United States workers" and that their work will "not adversely affect[] the wages and working conditions of United States workers." *See id.* § 214.2(h)(6)(i)(A). Once admitted, the guest workers' legal status is tied to performing labor for the specific employer who petitioned for the visas. *See id.* § 214.2. Under no circumstances can the workers remain in the country longer than three years. *Id.* § 214.2(h)(15)(ii)(C). What is more, if at any point the H-2B visas expire or the workers are dismissed from their jobs, they are required to immediately leave the country. *See id.* § 214.2(h)(6)(vi)(E), (h)(17)(iii)(C). To help ensure such an exit, throughout the period of H-2B employment, the guest workers must maintain a "residence in a foreign country" and have "no intention of abandoning" it. 8 U.S.C. § 1101(a)(15)(v)(H).

expenses violated the national minimum wage requirement by pushing the Hotel Workers' wages below the minimum wage in their first pay periods.

After only limited discovery, Decatur filed a motion to dismiss and for summary judgment, which the district court construed as contending that the Hotel Workers were not entitled to any protection by the FLSA and, alternatively, that the FLSA did not require Decatur to refund their transportation, visa and recruitment costs as part of the minimum wage requirement. In support of its motion, Decatur filed a unilateral statement of facts. The Hotel Workers produced evidence contesting Decatur's asserted facts and a cross-motion for partial summary judgment. The district court denied Decatur's motion to dismiss and for summary judgment and partially granted the Hotel Workers' motion, but only insofar as it held that, as temporary H-2B workers, they were protected by the FLSA's minimum wage requirements. The district court declined to decide whether the FLSA required the visa, transportation and recruitment expenses paid by the Hotel Workers to be treated as de facto wage deductions. On Decatur's further motion, the district court certified its order addressing only the threshold legal question—whether the FLSA's minimum wage protection applies to H-2B foreign temporary workers—for an interlocutory appeal under 28 U.S.C. § 1292(b). A motions panel of this court granted the appeal. The case was heard and decided twice by an oral argument panel. Ultimately, we granted an en banc rehearing vacating the panel's opinion.

## II.

Although the majority opinion concedes that the FLSA applies to the wages of the Hotel Workers, it does not heed the Supreme Court's decisions that require federal courts to give deference to the DOL's reasonable interpretation of its valid regulations under the FLSA. The majority does not attempt to reconcile its

decision with the Supreme Court's cases; nor does it try to show that the DOL's interpretations are unreasonable and therefore not controlling. Rather, the majority adopts an unfounded, eclectical approach, applying the statutory, regulatory and interpretive provisions it chooses while disregarding those that are inconsistent with its own notions of justice. I respectfully submit that my colleagues have lost sight of the proper role and perspective that the Supreme Court has said federal courts must maintain in construing and applying a congressionally authorized administrative agency's interpretations of its own regulations. In doing so, the majority opinion has reached a decision conflicting not only with the Supreme Court's decisions, but also with the DOL's interpretations of its own regulations, the decisions of the Eleventh Circuit and the decisions of several federal district courts. Regrettably, the majority opinion also deprives foreign temporary workers in this circuit of minimum wage protection against employers shifting to them costs incidental to and primarily for the benefit of the employers' businesses, *viz.*, the costs of visas, transportation and recruitment necessary to hiring foreign workers.

Congress created the Department of Labor in 1913 in part, "to foster, promote, and develop the welfare of the wage earners of the United States." An Act to Create a Department of Labor, Pub. L. No. 62-426, § 1, 37 Stat. 736 (1913). In 1938, Congress passed the Fair Labor Standards Act, creating the Wage and Hour Division in the Department of Labor and codifying worker protections such as minimum wage and overtime pay. 29 U.S.C. § 201 *et. seq*. Prior to the Hotel Workers filing this lawsuit in August 2006, the FLSA required Decatur to pay each of its employees not less than $5.15 an hour. 29 U.S.C. § 206(a)(1) (2006) (amended 2007). The FLSA also provides that the "'Wage' paid to any employee includes the reasonable cost, as determined by the Administrator [of the Wage and Hour Division], to the employer of furnishing such employee with board,

lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees." 29 U.S.C. § 203(m).

Congress expressly granted the DOL the authority to promulgate necessary rules, regulations or other orders under the FLSA and amendments thereto.[3] Moreover, in cases arising under the FLSA, the Supreme Court has held that the power of the DOL to administer the FLSA "necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)) (quotation marks omitted). "When an agency fills such a 'gap' reasonably, and in accordance with other applicable (*e.g.*, procedural) requirements, the courts accept the result as legally binding." *Id.* (citing *Chevron*, 467 U.S. at 843-44; *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001)).

The Supreme Court has also held that the DOL's interpretations of its own regulations are "'controlling' unless 'plainly erroneous or inconsistent with' the regulations being interpreted." *Long Island Care at Home*, 551 U.S. at 171 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997), in turn quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989), in turn quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)) (other quotation marks omitted). Our circuit and others have held that opinion letters, handbooks and other published declarations of an agency's views, including amicus briefs, are authoritative sources of the agency's interpretation of its own regulations. *Belt v. EmCare, Inc.*, 444 F.3d 403, 415 (5th Cir. 2006) ("We conclude that *Auer* applies, so we give controlling weight to the DOL's position adopted in the 1974

---

[3] *See* 29 U.S.C. § 259(a); *see also* Fair Labor Standards Act, Pub. L. No. 99-150,§ 6, 99 Stat. 787, 790 (1985); Fair Labor Standards Act, Pub. L. No. 89-601, § 602, 80 Stat. 830, 844 (1966); Fair Labor Standards Act, Pub. L. No. 87-30, § 14, 75 Stat. 67, 75 (1961).

opinion letter, 1994 Handbook, and *amicus* brief . . . ."); *see also IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 293 (4th Cir. 2007) (noting that "the Secretary[ of Labor]'s interpretation of her own combination-exemption regulation in opinion letters and in her amicus brief to this court is entitled to [*Auer*] deference"); *In re Farmers Ins. Exch.*, 481 F.3d 1119, 1129 (9th Cir. 2007) ("We must give deference to the DOL's interpretation of its own regulations through, for example, Opinion Letters.").[4]

As shown above, the statutory text of the FLSA clearly leaves relevant gaps. For example, it does not define the scope of terms such as "wage" and "board, lodging, or other facilities." 29 U.S.C. § 203(m). Consequently, it provides the DOL with the power to fill these gaps through reasonable regulations.

The DOL responded by issuing a series of regulations defining the minium wage under the FLSA. 29 C.F.R. pt. 531; *id.* §§ 531.32, 531.35. In doing so, it followed all necessary procedural requirements—"[i]t gave notice, it proposed regulations, it received public comment, and it issued final regulations in light of that comment." *Long Island Care at Home*, 551 U.S. at 165. *See also* 32 Fed. Reg. 13575 (1967) (promulgating the regulations). "The subject matter of the regulation[s] in question concerns a matter in respect to which the agency is expert, and it concerns an interstitial matter, *i.e.*, a portion of a broader definition, the details of which, as we said, Congress entrusted the agency to work out." *Long Island Care at Home*, 551 U.S. at 165.

---

[4] *See Belt*, 444 F.3d at 416 n.35 ("The most important reason for extending greater deference to an *amicus* brief that purports to interpret an agency's own ambiguous regulation (under *Auer*), than a brief that interprets the organic statute directly (under *Chevron*), is the greater expertise and familiarity of the agency with respect to the history and content of its own enacted rules. *See* John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 Colum. L. Rev. 612, 630-31 (1999).").

These regulations, promulgated in 1967 without subsequent change, explain that a minimum wage is only paid if it is provided "finally and unconditionally or 'free and clear.'" 29 C.F.R. § 531.35. They elaborate on this rule by continuing:

> The [minimum] wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act. See also in this connection § 531.32(c).

*Id.* § 531.35.

29 C.F.R. § 531.32(c), the provision cross-referenced in § 531.35, provides further examples of items understood to be for the benefit of the employer and therefore prohibited from being paid by the employee or charged against his or her wage so that the effective wage is reduced below the statutory minimum in any pay period. These examples include expenses that further the employer's business, such as "[s]afety caps, explosives, and miners' lamps," or that are incurred by the employee to fulfill his or her job function, such as "charges for rental of uniforms where the nature of the business requires the employee to wear a uniform," as well as costs that merely facilitate the smooth and consistent operation of the employer's enterprise, such as "company police and guard protection." *Id.* § 531.32(c).

29 C.F.R. § 531.32 also describes expenses that would not be considered to be for the employer's benefit and therefore could be paid by the employee or

deducted from his or her minimum wage despite reducing it below the statutory minimum. *Id.* § 531.32(a). Such expenses, the regulation explains, "must be something like board or lodging." *Id.* By contrast, it continues, they cannot include transportation costs where those costs are "incident of and necessary to the employment." *Id.*

The majority opinion does not challenge the validity or reasonableness of these DOL regulations. Therefore, according to the Supreme Court's cases, we must accept the DOL's regulations as legally binding and then consider the DOL's interpretations of them. Because the agency's interpretations are creatures of its own regulations, the DOL's interpretations of them are, under Supreme Court jurisprudence, controlling unless plainly erroneous or inconsistent with the regulations being interpreted. *See Long Island Care at Home*, 551 U.S. at 171 (citing *Auer*, 519 U.S. at 461).

For nearly fifty years, the DOL has interpreted its regulations pertinent to this case to mean that employers must bear the visa, transportation and recruitment costs incidental to their hiring of temporary foreign guest workers, and that they must reimburse these costs to workers whenever the employer's failure to do so would effectively reduce the employee's wage below the statutory minium in the first pay period.[5] Because the majority opinion contends incorrectly that the DOL did not interpret its regulations to require reimbursement of employees for any such costs prior to 1994, a detailed examination of the agency's interpretations is necessary.[6] Starting on May 11,

---

[5] While the minimum wage requirements of the FLSA must be satisfied in each pay period, only the first pay periods of the Hotel Workers are relevant here because their out of pocket visa, transportation and recruitment costs were expended prior to the commencement of their employment.

[6] Majority Op. 11-12 & 11 n.9.

1960, DOL opinion letters and handbooks have consistently held that, in the language of the regulations, guest workers' transportation costs from the point of hire to the place of employment were for the benefit of the employer as they were "incidental to the recruitment program[s]"; thus, they could not be properly considered as a "part of wages." Wage-Hour Opinion Letter, dated May 11, 1960.[7] A letter issued on September 26, 1977, reiterated this interpretation of the regulations, explaining that transportation costs must be paid by the employer because they were "regarded as part of the employer's *recruitment* cost, which must be borne by the employer." Wage-Hour Opinion Letter, dated Sept. 26, 1977 (emphasis added). Moreover, a letter from November 28, 1986, stated that "an employee who pays his or her own transportation must be *reimbursed* to the

[7] *See also* Wage-Hour Opinion Letter No. 937, ¶ 66-69 CCH-WH ¶ 30,949, dated Feb. 4, 1969 ("[B]ecause the cost of transportation to and from a work-site was normally regarded as part of the employer's recruitment cost, it could not be deducted from employees' wages, if the result would be to reduce the wages below the minimum required by either the Service Contract Act or the Fair Labor Standards Act."); Wage-Hour Opinion Letter No. 1139, ¶ 69-73, CCH-WH ¶30,709, dated Nov. 10, 1970 ("The cost of transporting employees to and from the point of hire would not properly be computed as part of individual employees wages for either 'direct' or 'indirect' employees as such expense is a cost incidental to an employer's recruitment program which should be borne by the employer. Moreover, withholding of such transportation costs could not be legally made to the extent that they reduce wages below statutorily required minimum wages or overtime compensation. FLSA, Section 3(m) and Regs., Section 531.36 and .37."); Wage-Hour Opinion Letter, dated Sept. 26, 1977 (stating the same principle); Wage-Hour Opinion Letter, dated Nov. 28, 1986 ("It remains our position that where, as here, migrant workers are hired in Puerto Rico for employment elsewhere, no deduction that cuts into the minimum wage may be made for transportation of migrant workers from the point of hire and return to that point. The rationale for this position is that transportation costs incurred in this connection are deemed to be primarily for the benefit of the employer."); U.S. Dep't of Labor, *Wage-Hour Field Operations Handbook*, ¶ 30c13(e) (1988) (stating the same principle); Wage-Hour Opinion Letter No. 531, 1990 WL 712744, dated June 27, 1990 ("Under the FLSA, it has always been the position of the Department of Labor that no deduction, that cuts into the minimum wage, may be made for transportation of workers from, the point of hire and return to that point. This is so, because such transportation costs incurred in this connection are deemed to be primarily for the benefit of the employer (29 CFR Part 531.32(c))."); Wage-Hour Opinion Letter dated May 10, 1996 ("The Department's current policy remains that worker-incurred transportation costs from the point of remote hire to the worksite are primarily for the benefit of the employer.").

extent the wages received the first week of employment less the transportation costs total less than the minimum wage for all hours worked"; the letter thereby made clear that the DOL interpretations do not solely address wage deductions, but also establish a reimbursement requirement. Wage-Hour Opinion Letter, dated Nov. 28, 1986 (emphasis added). *See also* Wage-Hour Opinion Letter, dated May 10, 1996 ("It is also the Department's policy that employees remotely hired under the H-2A program may not be required to bear the cost of transportation to the worksite to the extent that such expenses infringe on the employee's receipt of the FLSA minimum wage."). These same interpretations were in place at the time the Hotel Workers were hired and thus when their FLSA rights were violated in their first pay periods. Letter from Kristine A. Iverson, Assistant Sec'y for Cong. & Intergovernmental Affairs, U.S. Dep't of Labor, to Senator John W. Warner (May 30, 2001) ("Let me first summarize the [DOL's] existing policy with regard to enforcing the general [FLSA] interpretation on worker-incurred transportation costs. Employers are liable for worker-incurred transportation costs for remotely-hired workers from their point of hire to the employer's worksite."). Thus, contrary to the majority's assertion, a careful reading of the DOL's prior interpretations reveals that (1) well before 1994, in fact, as early as 1986, the DOL interpreted its regulations to require reimbursement of expenses that were primarily for the benefit of the employer because they reduced the employee's wage below the statutory minimum; and (2) as early as 1977, the DOL regarded travel costs as part of the employer's "recruitment costs," which must be borne by the employer. Therefore, historically, and at the time this case arose, the DOL interpreted its regulations to require the employer to reimburse foreign temporary workers their recruitment-related costs.

As recently set forth by the DOL in the 2009-2 Field Assistance Bulletin issued by the United States Department of Labor, Employment Standards

Administration, Wage and Hour Division, the DOL stated that its consistent, long-lived interpretations of its regulations, commencing in 1960, are the same as the DOL's current and prevailing interpretation of the regulations in 2009. In its Bulletin's interpretation, the DOL reads the pertinent regulations, which have not been changed since 1967 in any relevant sense, to require employers to reimburse H-2B employees for their inbound transportation, visa and recruitment costs.[8] The Bulletin explains that this has always been the DOL's interpretation of the relevant regulations,[9] except for a short-lived interpretation by the DOL issued in December 2008.[10] That single inconsistent interpretation

---

[8] Wage and Hour Division, U.S. Dep't of Labor, Field Assistance Bulletin No. 2009-2 (2009), *available at* http://www.dol.gov/whd/FieldBulletins/FieldAssistanceBulletin 2009_2.htm. The Bulletin states: "Accordingly, in the context of the H-2B temporary nonimmigrant visa program, we conclude that such travel and visa costs are for the primary benefit of the employer. Therefore, the employer must reimburse those costs in the first workweek to the extent that they reduce the employee's wage below the minimum wage." *Id.* at 12 (footnote omitted). "[U]nder both the visa program regulations and the FLSA, we believe that employers are responsible for paying the fees of any recruiters they retain to recruit foreign workers and provide access to the job opportunity." *Id.* "Whenever the employer is found to be the primary beneficiary, the employer must reimburse such expenses if the failure to do so would bring the employee's wage below the minimum wage." *Id.* at 9 n.3.

[9] The Bulletin states: "Over a period of 30 years beginning in 1960, Wage and Hour issued a series of opinion letters consistently concluding that the cost of transporting remotely hired temporary employees to and from the point of hire is a cost that must be borne by the employer, as a cost incidental to the employer's recruitment program, because the transportation is primarily for the employer's benefit; therefore, such transportation costs could not reduce the employees' wages below the required minimum wage." *Id.* at 3. Emphasizing that its prior interpretations required reimbursement, as well as prevented deduction, of such costs, the Bulletin also explains that "[i]n a letter dated May 10, 1996, Wage and Hour clarified that its 'policy remains that worker-incurred transportation costs from the point of remote hire to the worksite are primarily for the benefit of the employer.'" *Id.* at 4.

[10] The Bulletin also explicitly disagrees with the second panel opinion in this case, which, like the instant majority, had held that the FLSA does not require employers to reimburse H-2B employees for their transportation and related costs. The Bulletin states: "We thus disagree with the Fifth Circuit's recent decision in *Castellanos-Contreras* [*v. Decatur Hotels, LLC*] holding that the FLSA does not require employers to reimburse H-2B employees for their transportation and related fees. [576 F.3d 274 (5th Cir. 2009).] The court concluded that, because the FLSA kick-back regulation does not specifically address transportation, visa

was issued on December 19, 2008, but was withdrawn 98 days later, on March 26, 2009.[11] *See* Labor Certification Process and Enforcement for Temporary Employment in Occupations Other than Agriculture or Registered Nursing in the United States (H-2B Workers) and Other Technical Changes, 73 Fed. Reg. 78020,

---

and recruitment expenses and the Department of Homeland Security and Department of State regulations do not require employers to pay such expenses, they are not employers' business expenses. [*Id.*] The court declined to follow *Arriaga* [*v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228 (11th Cir. 2002)] both because that decision involved H-2A [workers], instead of H-2B [workers], and because it relied upon section 3(m) [of the FLSA, 29 U.S.C. § 203(m)] and the 'incident of and necessary to' standard in § 531.32 instead of § 531.35 (the kick-back regulation). The court also stated that the fact that the 2009 H-2B regulations newly require employers to forbid their recruiters from charging fees to employees suggests that such fees were not previously an employer expense. We believe that the *Arriaga* court correctly relied upon the section 3(m) principle—that an employer may take credit only for a facility that is for the employee's primary benefit and may not require an employee to bear an employer business expense if that will reduce the employee's pay below the minimum wage—as that principle is interpreted in both § 531.32 and § 531.35 (indeed, § 531.35 contains a cross-reference to § 531.32). The fact that § 531.35 does not specifically address transportation, visa and recruitment fees for temporary foreign workers is irrelevant to the analysis. The regulation sets forth the general prohibition against kick-backs and has one example relating to tools of the trade; that does not indicate that kick-backs for other employer expenses are permissible. The *Castellanos-Contreras* decision is, of course, binding precedent in the Fifth Circuit." *Id.* at 11 n.5. This statement does not deprive the DOL's interpretation of its controlling force. As the Supreme said in *Long Island Care at Home*, "[w]e have no reason . . . to suspect that [this] interpretation is merely a *post hoc* rationalizatio[n] of past agency action, or that it does not reflect the agency's fair and considered judgment on the matter in question. Where, as here, an agency's course of action indicates that the interpretation of its own regulation reflects its considered views . . . we have accepted that interpretation as the agency's own, even if the agency set those views forth" in response to litigation and decisions in the lower courts. 551 U.S. at 171 (third and fourth alteration in original) (quoting *Auer*, 519 U.S. at 462) (quotation marks omitted).

[11] "The [December 19, 2008] preamble [interpretation] inaccurately characterized these expenses as 'relocation' costs when in fact the expenses are costs incurred as a result of travel away from the employee's foreign home for temporary employment, not a change in the employee's domicile for permanent employment. Moreover, this situation involves the employer's assertion, and the Department of Labor's certification, that there are not sufficient U.S. workers available to perform the work. After weighing all the factors relevant to transportation and other costs incident to temporary employment under the H-2B program, we believe that the employer is the primary beneficiary of the temporary employee's travel and immigration-related costs." Field Assistance Bulletin at 7.

78039-78041 (Dec. 19, 2008) (containing the 2008 interpretation); Withdrawal of Interpretation of the Fair Labor Standards Act Concerning Relocation Expenses Incurred by H-2A and H-2B Workers, 74 Fed. Reg. 13261 (Mar. 26, 2009).

What is more, the Secretary of Labor, in an amicus brief filed in this case with our permission, interprets the DOL regulations at issue here as having always meant (except for the brief three-month period between December 2008 and March 2009) that transportation and visa fees are an incident of and necessary to H-2B employment, requiring employers to repay employees for advancing those costs, if failure to do so would reduce an employee's pay below the national minimum wage floor.[12] The Secretary concludes,

> Thus, but for a brief three-month period, the Department has expressed a consistent interpretation of the requirements of the FLSA for some 50 years. The Department's interpretation, as manifested by its extensively-supported Field Assistance Bulletin setting forth the application of its longstanding interpretation of the FLSA in the particular H-2B context, is entitled to substantial deference.[13]

The Secretary states that the DOL does not have sufficient facts in this case to express a view regarding whether Decatur ultimately must reimburse the Hotel Workers for their outlay of recruitment fees.[14] However, "the Secretary notes that the December 2008 H-2B final rule [which is distinct from the withdrawn preamble] prohibits employers and their agents from seeking or receiving payment for recruitment costs and requires employers contractually to forbid their foreign labor contractors or recruiters from seeking or receiving payments

[12] *See* En Banc Brief for the Sec'y of Labor as Amicus Curiae in Support of Plaintiffs-Appellees at 20, 24, 2010 WL 3049082.

[13] *Id.* at 24.

[14] *Id.* at 25 n.8.

from prospective employees."[15] In this connection, the Secretary also notes that the preamble to that final rule "states that requiring employers to incur such costs is reasonable because a recruiter is essential to the securing of such workers."[16] Finally, the Secretary concludes that "an employer would be responsible for paying for 'de facto recruitment fees charged for access to the H-2A program,'"[17] and that "[s]imilarly, under the FLSA, the employer is the primary beneficiary of the recruiter fees when the employer has retained a recruiter to locate foreign workers and effectively limits the job opportunity only to workers using that particular recruiter."[18] Therefore, the Secretary's amicus brief is an immediate and case-specific interpretation of the DOL's regulations that the transportation, visa and recruitment expenses alleged by the plaintiffs to have been required of them were primarily for the benefit of Decatur Hotels and thus must be reimbursed if they reduce the plaintiffs' wage below the statutory minimum.

"[T]he Secretary's interpretation comes to us in the form of a legal brief; but that does not, in the circumstances of this case, make it unworthy of deference." *Auer*, 519 U.S. at 462. *See also Long Island Care at Home,* 551 U.S. at 171 ("Where, as here, an agency's course of action indicates that the interpretation

---

[15] *Id.* (citing 20 C.F.R. § 655.22(g)(2), (j)).

[16] *Id.* (citing Labor Certification Process and Enforcement for Temporary Employment in Occupations Other than Agriculture or Registered Nursing in the United States (H-2B Workers) and Other Technical Changes, 73 Fed. Reg. 78020, 78037 (Dec. 19, 2008)).

[17] *Id.* (quoting Temporary Agricultural Employment of H-2A Aliens in the United States, 75 Fed. Reg. 6884, 6925 (Feb. 12, 2010)).

[18] *Id.* (citing *Rivera v. Brickman Group, Ltd.*, Civ. No. 05-1518, 2008 WL 81570, at *13-14 (E.D. Pa. Jan. 7, 2008) (unpublished); *Morales-Arcadio v. Shannorn Produce Farms, Inc.*, No. 605CV062, 2007 WL 2106188, at *14 (S.D. Ga. July 18, 2007) (unpublished)).

of its own regulation reflects its considered views—the Department has clearly struggled with the third-party-employment question since at least 1993—we have accepted that interpretation as the agency's own, even if the agency set those views forth in a legal brief."). "The Secretary's position is in no sense a '*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." *Auer*, 519 U.S. at 462 (alteration in original) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)). "There is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Id.*

The majority opinion does not appear to appreciate the significance of the Secretary's amicus brief, for it seems to follow its own rule that FLSA regulations are to be narrowly construed against employees and that minimum wage protections are to be withheld except as to employees plainly and unmistakably within their terms and spirit. "But that is a rule governing judicial interpretation of statutes and regulations, not a limitation on the Secretary's power to resolve ambiguities in his own regulations. A rule requiring the Secretary to construe his own regulations narrowly would make little sense, since he is free to write the regulations as broadly as he wishes, subject only to the limits imposed by the statute." *Id.* at 462-63.

Under the Secretary's and the DOL's legally binding interpretations of the DOL's regulations, Decatur must bear the visa, transportation and recruitment costs that, under the alleged facts, were necessarily incurred in temporarily hiring the foreign Hotel Workers to work in their New Orleans hotels in 2005 and 2006. Further, under the DOL's controlling view of the regulations, Decatur was obligated to reimburse the Hotel Workers the sums that each advanced to pay these necessary expenses; Decatur's failure to do so within each foreign worker's

first pay period caused it to pay the Hotel Workers sub-minimum wages in violation of the FLSA. As the DOL has explained, the visa, transportation and recruitment costs were incidental to and primarily of benefit to Decatur's business. Although the temporary foreign workers, of course, received some benefit from their employment, under the DOL's interpretation of its regulations, they were not the primary beneficiaries of Decatur's foreign worker program because they were visaed servants of Decatur while in the United States and legally bound to return to their foreign nations after their temporary employment. Thus, the majority opinion, by following its own erroneous view of the DOL's regulations rather than the Secretary's or the DOL's interpretations of them, reaches the legally opposite and clearly wrong conclusion that the FLSA can never afford the Hotel Workers, or any foreign temporary workers in their situation, any relief or compensation for having been made to absorb the visa, transportation and recruitment costs necessary to Decatur's foreign labor recruitment venture.

The Secretary's interpretation of other DOL regulations pertaining to recruitment fees paid by temporary foreign workers under the H-2B and H-2A programs further counsels against denying the Hotel Workers' claim for reimbursement of such expenses as a matter of law. The Secretary stated in her amicus brief that under these regulations there is at least one scenario in which the Hotel Workers could prevail, *viz.*, by showing that Decatur authorized or ratified foreign recruiters' actions in charging foreign workers substantial fees as a condition of employment by Decatur. In the district court, the Hotel Workers filed declarations asserting that they were charged fees by recruiters as a precondition of their employment by Decatur. *See* Declaration of Rodolfo Antonio Valdez-Baez (Recruiters provided Valdez-Baez a contract to work for Decatur,

pre-signed by a Decatur employee, and informed him that if he wanted the job he would have to pay them $1800 as part of "the cost of the program to be able to go and work for the Defendants." His declaration goes on "I understood that the [recruitment agency] was an agency utilized by Defendants for the recruitment of workers like me to work for them with H-2B visas."); Declaration of Oscar Ricardo Deheza-Ortega (stating very similar facts); Declaration of Daniel Castellanos-Contreras (stating that his recruiter told him "that in order to obtain an H-2B visa and this job with the Defendants, I had to pay all of the expenses of the program" and that the recruiter charged him a fee); Declaration of Francisco Sotelo-Aparicio (stating very similar facts). Moreover, they produced a contract between a subdivision of the defendants-employers' domestic recruiting firm and the defendants-employers stating that the subdivision agreed "to act as the authorized agent on Client's [the defendants-employers] behalf to prepare and submit the required documents to petition for temporary labor from outside the United States under the H2B [sic] labor certification process." The Hotel Workers also produced evidence showing that the defendants-employers worked closely with those recruiters to provide necessary job-related information and prepare the H-2B applications. The district court took as undisputed that the foreign recruiters were "sub-contract[ors]" of the defendants-employers' domestic recruiting firm. *Castellanos-Contreras v. Decatur Hotels, L.L.C.*, 488 F. Supp. 2d 565, 567 (E.D. La.), *amended in part by Castellanos-Contreras v. Decatur Hotels, L.L.C.*, No. 06-4340, 2007 WL 6867035 (E.D. La. July 19, 2007) (unpublished). The district court was never called upon to evaluate the credibility of the plaintiffs' declarations or attempt to resolve the obvious dispute between the parties over whether the recruiters acted as the defendants-employers' agents in charging the Hotel Workers recruiters' fees.

Therefore, no party, nor this court, has sufficient knowledge to decide whether, under the Secretary's interpretation of these regulations, Decatur owes reimbursements to the Hotel Workers for foreign recruitment costs. A proper reading of the district court's record and decision clearly shows that the facts surrounding the charging and payment of recruitment fees in this case were very much in dispute, undecided and subject to further and ongoing discovery when the district court certified only the threshold legal issue of FLSA coverage *vel non* to this court. Thus, the majority opinion manifestly errs in precluding the Hotel Workers from any possibility of recovering from Decatur for the fees they paid the recruiters in their foreign countries. Only by applying its own erroneous view of the DOL's regulations, instead of the Secretary's or the DOL's, or by assuming or reading into the record undisputed facts that simply are not there, or both, can the majority opinion reach its clearly incorrect conclusion.

Because the majority uses its own eccentric methodology, rather than that prescribed by the Supreme Court, it reaches erroneous conclusions, which it in turn uses as incorrect premises in support of the majority opinion.

First, the majority assumes that an H-2B foreign temporary worker may not recover from his or her employer for visa, transportation and recruitment costs, unless the FLSA and the DOL's regulations expressly and specifically authorize such recovery. Because "[n]o statute or regulation expressly states that inbound travel expenses must be advanced or reimbursed by an employer of an H-2B worker"[19] the majority concludes, "this lack of law would seem to end the matter as to both the travel and visa expenses."[20] As noted above, however, the

[19] Majority Op. 8.

[20] *Id.* at 9.

Supreme Court has not confined the DOL to such a literal or wooden approach in its regulations interpreting the FLSA. "When an agency fills [an explicit or implicit statutory] gap reasonably, and in accordance with other applicable (*e.g.*, procedural) requirements, the courts must accept the result as legally binding." *Long Island Care at Home*, 551 U.S. at 165 (quotations marks and citations omitted).

Second, the majority opinion similarly ignores the DOL's interpretation and the plain words of the regulation in reading 29 C.F.R. § 531.35. The majority concludes that for a cost to be "primarily for the benefit of the employer" under that regulation, it must fall literally within the "tools of the trade" term.[21] However, the DOL reasonably, and therefore permissibly, reads its regulation as using "tools of the trade" as merely an "example" of the kind of costs that are "for the employer's benefit."[22] The plain meaning of the regulation is the same.[23] Here, the DOL's interpretation of its regulation falls well within the principle

[21] Majority Op. 9-10.

[22] *See, e.g.*, Wage and Hour Division, U.S. Dep't of Labor, Field Assistance Bulletin No. 2009-2, at 11 n.5 (2009), *available at* http://www.dol.gov/whd/FieldBulletins/FieldAssistanceBulletin2009_2.htm ("The fact that §531.31 does not specifically address transportation, visa and recruitment fees for temporary foreign workers is irrelevant to the analysis. The regulation sets forth the general prohibition against kick-backs and has one example relating to tools of the trade; that does not indicate that kick-backs for other employer expenses are permissible."); En Banc Brief for the Sec'y of Labor as Amicus Curiae in Support of Plaintiffs-Appellees at 5, 2010 WL 3049082 ("The regulations further state that expenses such as tools of the trade . . . are primarily for the convenience of the employer and, therefore, may not be included as wages.").

[23] As 29 C.F.R. § 531.35, in pertinent part, plainly states: "For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act."

that an agency's interpretation of its own regulations is "'controlling' unless 'plainly erroneous or inconsistent with' the regulations being interpreted." *Long Island Care at Home*, 551 U.S. at 171 (other quotation marks omitted) (quoting *Auer*, 519 U.S. at 416, in turn quoting *Robertson*, 490 U.S. at 359, in turn quoting *Bowles*, 325 U.S. at 414).

Third, the majority opinion refuses to apply the DOL's interpretations of its valid regulations under the FLSA for the inaccurate reason that the Immigration and Nationality Act (INA) statutes and regulations require employers to pay H-2A workers' inbound transportation costs, but do not speak to H-2B workers' inbound transportation or visa expenses. This reasoning fails to recognize that the FLSA is a separate statutory scheme with distinct regulations that must be given their own meaning and effect. The FLSA and its regulations represent a self-sufficient set of rules meant to prevent "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202. *See Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) ("The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" (alteration in original) (quoting 29 U.S.C. § 202(a))). That the DOL's regulations under the FLSA, particularly regarding whether the minimum wage requirement is satisfied, are not repeated in other statutes or regulations does not detract from the regulations' binding legal effect. In *Powell v. United States Cartridge Co.*, the Supreme Court stated that to the extent the FLSA's requirements overlap with those of another statute, we must

apply the provisions of both so long as "compliance with one [does not] make[] it impossible to comply with the other." 339 U.S. 497, 519 (1950). Here, there has been no showing that it would be impossible for Decatur to comply with both the INA and its regulations and the FLSA's minimum wage requirements. *See Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1235 (11th Cir. 2002) ("[T]he Supreme Court has stated that when employment statutes overlap, we are to apply the higher requirement unless the regulations are mutually exclusive. There has been no demonstration here that it is impossible to simultaneously comply with both" guest worker and FLSA regulations. (citation and footnote omitted)).

Lest there be any doubt that the FLSA's minimum wage requirements control, the majority's own authority states as much. The cited immigration and nationality regulations, when describing the H-2B visa program, state that "an employer subject to the FLSA may not make deductions that would violate the FLSA." 20 C.F.R. § 655.22(g)(1). *See, e.g., Id.* § 655.17(g) (stating with regard to H-2B workers that "[t]he wage offer, or in the event that there are multiple wage offers, the range of applicable wage offers . . . must not be less than the highest of the prevailing wage, the Federal minimum wage, State minimum wage, or local minimum wage applicable throughout the duration of the certified H-2B employment").

Fourth, the majority opinion is simply mistaken in stating that we owe no deference to the DOL's interpretations of its regulations in its amicus brief and its 2009-2 Field Assistance Bulletin because they were filed or issued "after the events in question."[24] Both the Bulletin and the amicus brief demonstrate the

[24] Majority Op. 11.

agency's considered views and interpretations of its own regulations—the DOL has clearly studied and interpreted its regulations on the question of reimbursement of temporary foreign workers' visa, transportation and recruitment expenses since at least 1960. In such circumstances, the Supreme Court has accepted and adopted that agency's interpretation, even when the interpretation is contained in documents drafted after the case at bar was filed. *See Long Island Care at Home*, 551 U.S. at 171 (citing *Auer*, 519 U.S. at 462). Similarly, in the 2009-2 Field Assistance Bulletin, the DOL sets forth comprehensively the DOL's past, present and prevailing interpretation of its regulations: that employers are responsible for paying the transportation, recruitment and visa expenses of H-2B employees where shifting these costs to employees would effectively bring their wages below the FLSA minimum wage in their first work week of employment.

The Bulletin acknowledges that the DOL briefly advanced the opposite interpretation, for 98 days beginning December 19, 2008, but notes that this inconsistent interpretation was withdrawn on March 26, 2009.[25] The Bulletin clarifies that the DOL reaffirms its past long-standing interpretation as its prevailing interpretation and explains why it concludes that the employer, not the employee, is the primary beneficiary of visa and transportation costs necessary and incidental to the employment of temporary foreign workers.[26] As for the responsibility for foreign recruiter fees in obtaining such workers, the Bulletin provides:

---

[25] Wage and Hour Division, U.S. Dep't of Labor, Field Assistance Bulletin No. 2009-2, at 5-6 (2009), *available at* http://www.dol.gov/whd/FieldBulletins/FieldAssistanceBulletin2009_2.htm.

[26] *Id.* at 9-12.

> "The fact that a recruiter is essential to the securing of such a worker does not dissuade the Department from requiring the employer to bear the expense; rather, it underscores the classification of that payment as a cost allocable to the employer." 73 Fed. Reg. at 78037. The Department continues to believe that employees should not have to pay a recruiter for access to this visa program, because the employer is the primary beneficiary of these costs. Thus, under both the visa program regulations and the FLSA, we believe that employers are responsible for paying the fees of any recruiters they retain to recruit foreign workers and provide access to the job opportunity. *See Rivera v. Brickman Group, Ltd.*, 2008 WL 81570, at **13-14 (E.D. Pa. 2008) (because the H-2B employer required the employees to use a particular recruitment company, it was required to reimburse them where the recruiter fees reduced their wages below the FLSA minimum).[27]

Thus, as the Bulletin states, under the DOL's interpretation of its regulations—prevailing both (i) when the plaintiffs' FLSA actions accrued in 2005 and 2006 and (ii) at the time this court's en banc decision is rendered in 2010—employers are required to bear the visa, transportation and recruitment costs of foreign temporary workers, if shifting those costs to employees effectively reduces their wages below the FLSA minimum wage in their first work week of employment. Therefore, application of that long-standing DOL interpretation to the present case would be neither retroactive nor improper. Instead, the majority's refusal to defer to the DOL's prevailing interpretation, in effect, supplants it with the withdrawn 98 day aberrant interpretation that has no relevance to this case. The agency's interpretation—in its Bulletin and amicus brief— of the "regulations falls well within the principle that an agency's interpretation of its own regulations is 'controlling' unless 'plainly erroneous or inconsistent with' the regulations being interpreted." *Long Island Care at Home,* 551 U.S. at 171 (other

---

[27] *Id.* at 12.

quotation marks omitted) (quoting *Auer*, 519 US at 461, in turn quoting *Robertson*, 490 U.S. at 359, in turn quoting *Bowles*, 325 U.S. at 414).[28]

Fifth, the majority opinion's efforts to distinguish the underlying principles that govern this case from those applied by the Eleventh Circuit in *Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228 (11th Cir. 2002), are superficial and without merit. It is true that the Eleventh Circuit performed a direct plain language analysis of 29 C.F.R. §§ 531.32, 531.35, rather than a deferential reading of the DOL's interpretations as I have applied here, following the Supreme Court's cases. However, the *Arriaga* court's interpretations of the regulations are almost identical to the DOL's interpretations. The Eleventh Circuit concluded that "it is

---

[28] The majority opinion's efforts to suggest a retroactivity problem either in the application of the DOL's interpretation in the Bulletin or its interpretation in the its amicus brief are without merit. *See* Majority Op. 11 & n.9. This case does not call upon us to decide an arguable retroactivity issue. Under 29 U.S.C. § 255, an employee's right of action against his employer for underpayment of minimum wages accrues upon the employer's violation of the FLSA. *Cf. Unexcelled Chem. Corp. v. United States*, 345 U.S. 59, 65 (1953) ("We conclude that 'the cause of action accrued' . . . when the minors were employed."); *Riley v. Dow Corning Corp.*, 767 F. Supp. 735, 743 (N.D.N.C. 1991) (stating a plaintiff's claim under the FLSA accrued when he was denied his proper wage), *aff'd*, 986 F.2d 1414 (4th Cir. 1993) (unpublished table decision). Thus, the Hotel Workers' rights of action against Decatur because of its alleged FLSA violations accrued in 2005 and early 2006; and the workers timely brought this suit on August 16, 2006. The DOL's interpretation of the regulations that foreign temporary workers' visa, transportation and recruitment costs were for the employer's benefit was the same then as it is now. Thus, we are not required to choose between two different interpretations of the regulations in this case. Moreover, as noted above, the DOL's decisions to, at times, not enforce its interpretations of its regulations, in no way altered the meaning or import of those interpretations, which created a right for the Hotel Workers to have the expenses at issue in this appeal reimbursed. 29 C.F.R. § 790.18(a). The cases cited by the majority opinion, *Bradley v. School Board of Richmond*, 416 U.S. 696, 715-17 (1974) (holding that "an appellate court must apply the law in effect at the time it renders its decision," unless such application would work a manifest injustice or there is statutory direction or legislative history to the contrary), and *Landgraf v. USI Film Products.*, 511 U.S. 244, 286 (1988) (holding that provisions of the Civil Rights Act of 1991 creating a right to recover compensatory and punitive damages for certain violations of Title VII, and providing for trial by jury if such damages are claimed, did not apply to Title VII case pending on appeal when the statute was enacted on retroactivity grounds), are inapposite to this case.

apparent that the line is drawn" between expenses that are for the benefit of the employer and those that can be charged to the employee "based on whether the employment-related cost[s] [are] a personal expense that would arise as a normal living expense." *Arriaga*, 305 F.3d at 1243. "Uniforms provide an illustration of this dividing line. 'Charges for rental uniforms,' when required by the employment, are considered to be primarily for the benefit of the employer[,] 29 C.F.R. § 531.32(c)[,]" because they would not arise from normal living. *Id.* at 1243-44. By contrast, "if the employer merely prescribes a general type of ordinary basic street clothing to be worn while working and permits variations in details of dress[,] the garments chosen would not be considered uniforms . . . and [are] therefore not primarily for the benefit of the employer" as their expense would be analogous to a typical living expense. *Id.* at 1244 (citations omitted) (first alteration in original) (quoting *Ayres v. 127 Rest. Corp.*, 12 F. Supp. 2d 305, 310 (S.D.N.Y. 1998), in turn quoting U.S. Dep't of Labor Wage & Hour Field Operations Handbook § 30c12(f)) (quotation marks omitted).

In light of this plain language reading of the regulation, the Eleventh Circuit held that foreign guest workers' inbound "transportation cost[s] [are] 'an incident of and necessary to the employment,'" as their "employment necessitates that one-time transportation costs be paid." *Arriaga*, 305 F.3d at 1242 (quoting 29 C.F.R. § 531.32(a), (c)). Therefore, these costs must be borne by the employer. *Id.* at 1242-43. Similarly, the "visa costs here were necessitated by" the employers' use of the guest worker program. *Id.* at 1244. "By participating in the . . . program, the [employers] created the need for these visa costs, which are not the type of expense they are permitted to pass on to the" workers. *Id.*

The Eleventh Circuit did hold that the recruitment fees at issue in that case did not need to be reimbursed. *Arriaga*, 305 F.3d at 1244-45. However, this was

only "[b]ecause the principles of agency law d[id] not hold the [employers] responsible for the recruitment fees." *Id.* at 1245. Nonetheless, under the Eleventh Circuit's logic, had the recruiters been found to be the employers' agents, as the Hotel Workers in the instant case allege and adduce evidence to show, the court would have held that recruitment costs also must be reimbursed. It would have been an expense incidental to and incurred for the benefit of the employers.

The majority also would have us ignore the entirety of *Arriaga* because it addresses H-2A rather than H-2B workers; "H-2A" denoting that the guest workers at issue were involved in agricultural work, rather than non-agricultural work for which H-2B visas are issued. 8 C.F.R. § 214.2(h)(1)(ii) (distinguishing H-2A from H-2B workers based on whether they were performing "agricultural work of a temporary or seasonal nature"). Yet this argument fails to recognize relevant cases and contradictory facts. Specifically, the Eleventh Circuit has adopted and applied *Arriaga*'s reasoning in the H-2B context as well. *See Morante-Navarro v. T&Y Pine Straw, Inc.*, 350 F.3d 1163, 1165-66 & n.2 (11th Cir. 2003). So have several district courts. *See Rosales v. Hispanic Employee Leasing Program, LLC*, No. 1:06-CV-877, 2008 WL 363479 (W.D. Mich. Feb. 11, 2008) (unpublished); *Rivera v. Brickman Group, Ltd.*, Civ. No. 05-1518, 2008 WL 81570 (E.D. Pa. Jan. 7, 2008) (unpublished); *Recinos-Recinos v. Express Forestry Inc.*, No. Civ. A. 05-1355, 2006 WL 197030, at *14 (E.D. La. Jan. 24, 2006) (unpublished). Further, there is no reasoned basis on which to distinguish between H-2A and H-2B workers. The H-2A/H-2B distinction is a relatively new one. The regulations at issue were promulgated when the H-2A and H-2B programs were one and the same. *See* 29 C.F.R. §§ 531.30, 531.32, 531.35; Glen M. Krebs, *H-2B or Not To Be*, 56-Jul Fed. Law. 62, 62 (2009). Therefore, *Arriaga* should be recognized as pertinent precedent and the majority opinion should be understood as creating a

circuit split without justification. Moreover, and perhaps most importantly, the DOL has approved of *Arriaga*'s analysis of the regulations as being consistent with its own, while criticizing the panel opinion in this case as being in conflict with the regulations.[29]

Sixth, the majority incorrectly asserts that "[t]he first time the Department specifically spoke to reimbursement in the context of alleged 'kickbacks' like those at issue here was its announcement in 2008." Majority Op. 12. As quoted above, the DOL's 1986 opinion letter stated that "an employee who pays his or her own transportation must be *reimbursed* to the extent the wages received the first week of employment less the transportation costs total less than the minimum wage for all hours worked." Wage-Hour Opinion Letter, dated Nov. 28, 1986 (emphasis added). That is the precise circumstance presented in this case. The majority's statement that this letter speaks to deductions, not reimbursements, is belied by the quoted language. Majority Op. 12 n.10. So is the majority's contention that this interpretation is limited to the specific facts presented in the opinion letter—the interpretation does not refer only to the specific employees of the employer in that case but to an employee generically. Majority Op. 12 n.10.[30]

---

[29] Wage and Hour Division, U.S. Dep't of Labor, Field Assistance Bulletin No. 2009-2, at 9, 11 n.5 (2009), *available at* http://www.dol.gov/whd/FieldBulletins/FieldAssistanceBulletin2009_2.htm.

[30] The majority also argues the 1986 letter should be ignored because it was a "*post hoc* rationalization" of the agency's position, unworthy of deference under *Auer*. Majority Op. 12 n.10 (citing *Auer*, 519 U.S. at 462). It is unclear why the majority thinks this out-of-context quotation from *Auer* is applicable to the 1986 letter. The language from *Auer* reflected the Court's concern with whether and when it should defer to an agency position adopted for the purposes of the litigation at bar, not with providing deference to an agency position taken decades before the present litigation was initiated. *Auer*, 519 U.S. at 462 (noting that the fear of agency "*post hoc* rationalization" was in response to the Court possibly deferring to an agency amicus brief submitted in the case at bar, not deferring to prior agency interpretations (alteration omitted)). Moreover, the notion that the 1986 letter was developed in response to

Moreover, the 1986 letter is merely a clear and accurate illustration of the DOL's consistent position regarding the meaning of the FLSA. Wage-Hour Opinion Letter, dated Nov. 28, 1986. The regulation, 29 C.F.R. § 531.35, promulgated in 1967, prohibits "kick-backs" from the employee to the employer that reduce the employee's wage below the statutory minimum. As cited above, the DOL has also issued numerous other interpretations of the FLSA, all of which, prior to 2008, are consistent with the 1986 opinion letter. The DOL's amicus brief to this court and its 2009 Field Assistance Bulletin state that the agency's interpretation of its regulations has been consistent except for the 98 day period at the turn of 2008-2009; and these consistent interpretations are fully worthy of deference under the Supreme Court's decisions.

To the extent that the majority means to suggest that these clear and unequivocal agency interpretations should be disregarded because the DOL was not, at times, "enforcing" its interpretations, Majority Op. 12, such an argument is also erroneous. *Auer* requires us to give deference to an agency's *interpretations*

---

litigation appears baseless. The citations in the letter are to a District Court for the District of New Jersey judgment entered in October 1979, more than seven years before the letter was written. *See* Wage-Hour Opinion Letter, dated Nov. 28, 1986 (citing *Marshall v. Glassboro Servs. Ass'n, Inc.*, No. 78-377, 1979 WL 1989 (D.N.J. Oct. 19, 1979)).

In a further effort to discredit the 1986 letter, the majority also falls back on some of its earlier platitudes, arguing the letter should be disregarded because it addressed H-2A, not H-2B, workers and it is "doubtful that even the most diligent employer could have readily accessed" the letter to know his or her responsibilities and thus might "not know the amount" he or she was required to pay the employees. Majority Op. 12 n.10. However, as described above, the H-2A/H-2B distinction drawn by the majority is a false one, in no way supported by the majority's citations or analysis. Moreover, as already noted, an employer need not have relied upon the letter to discern its employees' rights to reimbursement for transportation, visa and recruitment expenses, as there were numerous other interpretations and regulations supporting employees' rights to the reimbursements sought in the instant case. The majority's concern that the minimum wage might be difficult to calculate is of no moment. Majority Op. 12 n.10. The FLSA imposes a minimum wage requirement upon the defendants-employers and it must be satisfied.

of its regulations, not to its enforcement practices. *See Long Island Care at Home*, 551 U.S. at 171 (quoting *Auer*, 519 U.S. at 461). The DOL's regulations, in place since 1947, state that "administrative practices and enforcement policies differ from . . . [the] decisions or views which the agency has set forth in its regulations, orders, rulings, approvals, or interpretations." 29 C.F.R. § 790.18(a). *See also id.* § 790.18(c) ("An administrative practice or enforcement policy may, under certain circumstances be at variance with the agency's current interpretation of the law."). Thus, that the DOL chose not to enforce certain regulations or interpretations in particular cases or periods should in no way be understood as altering the DOL's interpretations of the regulations themselves. *Id.* § 790.18(a), (c). Enforcement is a discretionary agency action. *See Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("As we have repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."). Under the FLSA, these plaintiffs have an independent right of action that is anchored in the statute's rights and responsibilities, as properly interpreted by the Department of Labor. *See* 29 U.S.C. § 255.

Seventh, the majority contends that the Hotel Workers "proffered no evidence to support the concept that Decatur required any recruitment fees to be paid to the foreign recruiters or that it required the Workers to use these recruiters to apply to Decatur." This is not true. Even under the majority's incomplete and distorted view of the district court's order, the majority recognizes that the district court explicitly stated that additional discovery was required before it could resolve any of the disputed issues of fact pertaining to Decatur's alleged liability for the reimbursement of visa, transportation and recruitment costs. As demonstrated above, the plaintiffs introduced numerous declarations

suggesting that the recruiters acted as the defendants' agents and charged fees for their recruitment services. Consequently, the majority errs here, in addition to its errors discussed above, in failing to remand this case in order to allow the district court to consider and decide this controverted factual issue.

For these reasons, I respectfully but vigorously dissent from the majority opinion's refusal to defer to the Secretary's and DOL's reasonable interpretations of the agency's own valid regulations under the FLSA and from the majority's order to the district court to enter a final judgment dismissing the plaintiffs' claims for unpaid minimum wages without a trial on the merits.

## III.

This court of appeals has jurisdiction under 28 U.S.C. § 1292(b) to address the issue of whether the FLSA applies to H-2B workers; it does not have jurisdiction to address whether the hotels violated the FLSA, or whether the hotels owe the workers reimbursement for transportation, visa or recruitment expenses, because those issues are part of the merits of the case and are not material to the order issued by the district court that simply held that the FLSA applies to H-2B workers.

Section 1292(b) provides, in pertinent part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals . . . may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order . . . .

28 U.S.C. § 1292(b).

Under § 1292(b), a court of appeals can "exercise jurisdiction over any question that is included within the order that contains the controlling question of law identified by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 204 (1996) (quoting *Yamaha Motor Corp., U.S.A. v. Calhoun*, 514 U.S. 1126 (1995)) (internal quotation marks omitted). But to be included within the order, the question must at least be material to that order. *See* Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b)*, 88 Harv. L. Rev. 607, 629 (1975) (stating that the "scope of review [includes] all issues material to the order in question"), *quoted in Yamaha*, 516 U.S. at 205. As this court succinctly put it in *Adkinson v. International Harvester Co.*: "An appeal under 28 U.S.C. § 1292(b) is from the certified order of the district court, not from any other orders that may have been entered in the case." 975 F.2d 208, 211 n.4 (5th Cir. 1992) (citing *United States v. Stanley*, 483 U.S. 669, 677 (1987)). "Our jurisdiction, although not confined to the precise question certified by the district court, is confined to the particular order appealed from." *Id.* (citing *Stanley*, 483 U.S. at 677). "In short, on a certified interlocutory appeal under section 1292(b), we have jurisdiction to hear only questions that are material to the lower court's certified order." *Id.* (citing *United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1554 n.2 (11th Cir. 1990)).

Here, the order issued by the district court simply holds that "H-2B guestworkers are entitled to the protections of the FLSA," *Castellanos-Contreras v. Decatur Hotels, L.L.C.*, 488 F. Supp. 2d 565, 566 (E.D. La.), *amended in part by Castellanos-Contreras v. Decatur Hotels, L.L.C.*, No. 06-4340, 2007 WL 6867035 (E.D. La. July 19, 2007) (unpublished)—that is, that the FLSA applies to H-2B workers *period*. A fair and common-sense reading of the district court's opinions shows that this simple holding of law is all the district court judge intended, and

all the defendants originally intended—that this court review and either affirm or reverse on interlocutory appeal. No other reading of the district court's opinions makes any sense. The district judge said repeatedly that he was not deciding whether the defendants had violated the FLSA, or whether the defendants owed the workers reimbursement of any transportation, visa or recruitment expenses. *Id.* at 572 n.5 ("[W]hether or not the Defendants have violated the FLSA is a factual issue that is not appropriate for summary judgment."); *Castellanos-Contreras*, 2007 WL 6867035, at *2 ("[T]he Court . . . refus[es] to determine, as a matter of law, whether or not the FLSA has been violated in this case . . . ."). Further, the district court refused to stay further proceedings pending resolution of this interlocutory appeal, but instead "allow[ed] discovery to proceed uninhibited." *Castellanos-Contreras*, 2007 WL 6867035, at *2. As an experienced district court judge, he evidently anticipated that this court would affirm his order that the FLSA applies to this case and that he would have to try the merits issues of the case, including violations *vel non*, and, if there were violations, reimbursements *vel non*. As a very competent trial judge, he would not have certified or requested that we review issues that he had not yet tried or decided, *viz.*, whether the defendants had violated the FLSA and, if so, whether they owed the plaintiffs reimbursements. His plain intention was to issue an order deciding the "threshold legal issue in this case, namely whether the FLSA applies to non-agricultural guestworkers brought to the United States under the H-2B program," 488 F. Supp. 2d at 567, and, if this court affirmed, to proceed to trial on the merits. He did not intend to shirk his duty and allow this court to decide the case on the merits, including violation and reimbursement issues; he merely intended to have us resolve the threshold legal issue of FLSA applicability before expending further significant judicial trial court resources.

Because the order the district court certified for our review was only the threshold legal ruling that the FLSA applies to H-2B workers, the questions of the defendants' alleged violations and reimbursement obligations plainly are not material or even relevant to the certified threshold legal order. Once we decide that the district court correctly held that the FLSA applies, that decision will stand no matter what the district court ultimately decides in respect to whether there were violations or whether reimbursements are due. Thus, these questions going to the merits of this particular case are simply not material or relevant to the threshold question of whether the FLSA applies to H-2B workers. Accordingly, the violations and reimbursement issues are not material to the district court's certified order and are not properly before us. *See Adkinson*, 975 F.2d at 211 n.4.

Viewed in this light, the present case is ultimately a simple one in which the certified order and the certified question are coterminous and virtually identical. The order that the district court certified was that the FLSA applies to H-2B workers; the question that the district court certified is whether the FLSA applies to H-2B workers. However, even in more complicated cases in which the certified order and the certified question are not closely similar, this court and others have adhered to the same principle that courts of appeals have jurisdiction under § 1292(b) to hear only questions that are material to the district court's certified order.

For instance, in *Link v. Mercedes-Benz of North America, Inc.*, the Third Circuit refused to consider on § 1292(b) interlocutory appeal the issue of "whether there may be separate juries utilized during the liability and damage phases of a bifurcated trial" because the portion of the district court decision addressing that question was not "definitive, effective, and in a posture capable of affirmance or reversal." 550 F.2d 860, 861, 863 (3d Cir. 1976) (en banc). The district court had

opined about the inefficiencies inherent in a bifurcated trial and had contemplated alternatives. *Id.* at 863. However, it had "entered no order directing separate juries and whether it [would do so was] a matter of pure speculation" at the time of the interlocutory appeal. *Id.* at 864. Therefore, the appellate court found that deciding the question of separate juries would not only be improper under § 1292(b), but would be an unconstitutional exercise of its jurisdiction because its judgment would be "an advisory opinion." *Id.* at 864-65.

Here, all that has happened with this case is that the district court has determined that the FLSA applies to H-2B foreign temporary workers. Therefore, to reach an entirely distinct determination, not resolved by the district court, such as whether the defendants are liable under the FLSA for the visa, transportation and recruiter fee reimbursements sought by the plaintiffs, would be improper under § 1292(b). That question is neither contained within, nor material to our reviewing of the order appealed from deciding only that the FLSA applies to the wages of H-2B foreign temporary workers.

Likewise, in *Adkinson*, our court recognized that the district court had decided only one legal issue in its order denying summary judgment (namely, "whether the Mississippi Supreme Court would apply principles of contribution and indemnity to a breach of implied warranty of merchantability claim," 975 F.2d at 211-12), and therefore determined that the other issues the appellant sought to raise on appeal (timely notification and proximate cause, *id.* at 211 n.4) were "not material to the District Court's order" and hence "not properly before us," *id.* at 211 n.4. The court in *Adkinson* followed the principle that "we have jurisdiction to hear only questions that are material to the lower court's certified order." *Id.* The questions that were "not properly before us" were not material to the question the district court had decided: whether contribution and indemnity principles

applied under Mississippi law had nothing to do with whether a party had given timely notification or whether a party's breach of warranty had proximately caused harm to another party. *Id.* at 211-12 & n.4.

In the instant case, the issues of whether the defendants violated the FLSA and whether they owe any reimbursements are just like the issues of notification and proximate cause in *Adkinson*: They are not properly before us because they are not material to the district court order from which this interlocutory appeal was taken. The district court did not need to decide those subsidiary issues in order to decide whether the FLSA has any application at all to this case, and the judge explicitly and repeatedly wrote that he was deciding only whether the FLSA applied. Just as in *Adkinson*, the additional issues the appellants seek to raise are not properly before this court.

Again, in *Withhart v. Otto Candies, L.L.C.*, 431 F.3d 840 (5th Cir. 2005), our court recognized the "limited" nature of "[o]ur appellate jurisdiction under § 1292(b)" and did not review additional mixed questions of law and fact that went beyond the "'controlling question of law'" that the district court's order had decided. *Id.* at 841 (quoting 28 U.S.C. § 1292(b) and *Malbrough v. Crown Equip. Corp.*, 392 F.3d 135, 136 (5th Cir. 2004)). The legal questions material to the district court's order were "whether general maritime law recognizes suits by vessel owners for property damage caused by negligent seamen," and if so, "whether the Jones Act or the FELA precludes" such claims. *Id.* at 842-43. This court therefore emphasized that it had jurisdiction to review "only" whether the appellant could assert such a claim, and not whether the claim could succeed, i.e., whether the defendant seaman was liable. *Id.*

In this case, likewise, the district court decided a "controlling question of law" (whether the FLSA applies to H-2B workers) in the order certified for

interlocutory appeal; it expressly did not decide the mixed question of law and fact concerning whether the defendants are actually liable for reimbursing visa, transportation and recruitment costs to the plaintiffs under the FLSA. Just as in *Withhart*, "our review is limited" to the certified order holding that the FLSA applies to H-2B workers; we do not have jurisdiction to reach the subsequent, immaterial questions concerning whether the defendants violated that law and are liable for reimbursements.

"The manifest purpose of § 1292(b) is to support appeal from orders that cannot otherwise be reviewed by final judgment appeal or interlocutory appeal under some other provision of § 1292(b)." 16 Charles Alan Wright et al., *Federal Practice and Procedure* § 3929.1, at 400 (2d ed. 1996 & Supp. 2010). It is self-evident that the purpose of § 1292(b) is not to undermine 28 U.S.C. § 1291's requirement of final judgment on the merits of a case before it may be appealed of right. "The basic requirement for interlocutory appeal under § 1292(b) is that the district court have made an order" that is not otherwise appealable, but has "some concrete effect." *Id.* § 3930, at 416-17. A district court's mere speculation on the consequences of one possible trial resolution of disputed factual issues is not ripe for review under § 1292(b). *See id.*

No one can reasonably dispute that the district court has never tried the merits of the present case, which include the issues of FLSA violations and reimbursement *vel non*; that the judge in fact stated repeatedly they were not ripe for trial; and that he therefore refused to stay the trial court proceedings and allowed full discovery to proceed in preparation for trial. The majority opinion's argument that the district court somehow decided or issued an order on the merits of the case is simply an unfounded assertion that is without merit. The only concrete legal order made by the district court is the order that the FLSA applies

to H-2B workers such as the plaintiffs in this case. That is the only order certified by the district court to this court in the interlocutory appeal. Because no judge on this court appears to disagree with the order that the FLSA applies to H-2B workers, it is this court's duty to affirm that order and to remand the case to the district court for trial on the merits, including whether the defendants have violated the FLSA and, if so, whether they owe reimbursements to the plaintiffs.

* * *

For these reasons, I respectfully but emphatically dissent.